EMN:MKM/SPN/TH/BDM
F.#2015R01827

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

SERGIO JADUE,

          Defendant.

I N F O R M A T I O N

Cr. No. <u>15-570  (RJD)</u>
(T. 18, U.S.C., §§
981(a)(1)(C), 1349,
1962(d), 1963(a), 1963(m)
and 3551 <u>et</u> <u>seq.</u>; T. 21,
U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

- - - - - - - - - - - - - - - - - -X

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

      At all times relevant to this Information, unless otherwise indicated:

I.   <u>The Enterprise</u>

      1.   The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC") – together with affiliated regional federations, national member

associations, and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2. The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide. The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport. The members of the enterprise, as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions.

3. The enterprise operated in the Eastern District of New York and elsewhere, including overseas.

A.    FIFA

4. FIFA was the international body governing organized soccer, commonly known outside the United States as

2

football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was composed of as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following suit in the 1990s.  At various times relevant to the Information, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

5.     Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA: CONCACAF, CONMEBOL, UEFA, CAF, AFC, and OFC.  Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

6.     FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the

3

administrative body.  FIFA also had a president, who represented the association worldwide and was responsible for the implementation of decisions.  FIFA also operated several standing committees, including a committee that organized Olympic soccer qualifying tournaments, whose members included soccer officials from various national member associations. FIFA also operated through a number of subsidiaries, including subsidiaries that assisted with FIFA's media and marketing activities.

7.     The FIFA congress was composed of delegates from each of its member associations as well as observers appointed by each of the confederations.  Among other things, the congress was responsible for amending FIFA's statutes and electing the FIFA president.  The congress convened in ordinary sessions biennially or annually, and at other times in extraordinary sessions in various countries around the world, including the United States.

8.     The FIFA executive committee, often referred to as the "ExCo," was composed of the FIFA president and a number of ordinary members, some of whom also held the title of vice president.  The president was elected by the FIFA congress.  The vice presidents and ordinary members were appointed by the confederations.  Each confederation was entitled to appoint a specific number of vice presidents and ordinary members, as set

4

forth in the FIFA statutes.  Since at least 1996, the executive
committee was required by FIFA statutes to meet at least twice
per year.  The executive committee held meetings at FIFA's
headquarters in Zurich, Switzerland, as well as in various
countries around the world, including the United States.

9.  Among other tournaments, FIFA organized the World
Cup, the sport's premier event, a quadrennial international
tournament involving the senior national men's teams of 32
nations.

10.  Since at least 1996, under FIFA's statutes, the
six continental confederations had certain rights and
obligations, including, among other things, that they comply
with and enforce FIFA's statutes, regulations, and decisions and
work closely with FIFA to further FIFA's objectives and organize
international soccer competitions.

11.  FIFA's purpose was, among other things, to
develop and promote the game of soccer globally by organizing
international competitions and by creating and enforcing rules
that govern the confederations and member associations.  FIFA
helped finance the confederations and their member associations,
including by providing funds through the Financial Assistance
Program and the Goal Program.

12.  FIFA first instituted a written code of ethics in
October 2004, which code was revised in 2006, again in 2009, and

most recently in 2012 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues, and clubs. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

B.    The Continental Confederations

13.    In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis. The leaders and representatives of the confederations conducted business with one another, as well as with the leaders and associates of FIFA, throughout the year at locations around the world, including in the United States. Each confederation was governed by its own congress, general secretariat, executive

6

committee and standing committees. From time to time, some of
the confederations, like FIFA, also operated through
subsidiaries, including subsidiaries that assisted with media
and marketing activities.

14. CONCACAF was a continental soccer confederation
incorporated, since 1994, as a non-profit corporation in Nassau,
Bahamas. CONCACAF comprised as many as 41 member associations,
representing organized soccer in North America, Central America,
the Caribbean, and three South American countries. The United
States and two of its overseas territories, Puerto Rico and the
United States Virgin Islands, were members of CONCACAF. From
approximately 1990 to 2012, CONCACAF's principal administrative
office was located in New York, New York, where the former
general secretary was based (until the end of 2011) and where
CONCACAF regularly conducted business. Beginning in 2012,
CONCACAF's principal administrative office was located in Miami,
Florida, where the new general secretary was based. CONCACAF
also conducted business at various times throughout the United
States, including in the Eastern District of New York, as well
as in foreign countries within and outside the confederation.
Among other tournaments, CONCACAF organized the Gold Cup,
featuring the men's national teams from CONCACAF and, from time
to time, other confederations, as well as a tournament featuring
the top men's professional league – or club – teams. In June

2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

15.   CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asunción, Paraguay and, later, Luque, Paraguay.  CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams, including the Copa Libertadores, Copa Sudamericana, and Recopa Sudamericana.  Since 1993, the United States has participated in the Copa América as an invitee three times, and in 2016 the United States will host and participate in a special edition of the tournament, the Copa América Centenario, to commemorate its centennial.  At least as early as 2013, CONMEBOL maintained a code of ethics applicable to all CONMEBOL officials, among others, that, among other things, prohibited bribery and corruption and imposed a duty of loyalty.

16.   CONCACAF and CONMEBOL also organized World Cup qualifier matches played by national teams seeking to qualify for the World Cup, using a variety of formats, and, from time to time, organized inter-confederation competitions, often with the support and approval of FIFA.

8

C.    The Regional Federations and National Associations

17.    In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

18.    The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States, the United States Soccer Federation, was based in Chicago, Illinois.

19.    The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level.  Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other venues worldwide.

D.    The Sports Marketing Companies

20.    FIFA and the continental confederations, as well as smaller regional federations and national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport.  These sports marketing companies, including multinational corporations with

9

headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

21. The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for the enterprise. The United States was an increasingly important and lucrative market for the commercialization of these rights.

II. **The Defendant**

22. The defendant SERGIO JADUE, a citizen of Chile, was an individual employed by and associated with the enterprise. At various times relevant to the Information, JADUE was the president of La Asociación Nacional de Fútbol Profesional de Chile ("ANFP"), the Chilean soccer federation, a vice president of CONMEBOL, and a FIFA official who served on one of FIFA's standing committees.

23. As an official of ANFP, CONMEBOL, and FIFA, the defendant SERGIO JADUE was bound by fiduciary duties to the three organizations.

10

III. **The Defendant's Co-Conspirators**

24.  The defendant SERGIO JADUE conspired with, among others, a number of soccer officials and sports marketing executives, including the following executives, whose identities are known to the United States Attorney:

25.  At various times relevant to the Information, Co-Conspirator #1 was the founder and owner of the Traffic Group, a multinational sports marketing company based in São Paulo, Brazil.  The Traffic Group was comprised of, among other entities, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic Brazil"), Traffic Sports International, Inc. ("Traffic International"), Traffic USA, Traffic Sports Europe B.V., and Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group").

26.  At various times relevant to the Information, Co-Conspirator #2 was a controlling principal of Torneos y Competencias S.A. (together with its affiliates, "TyC"), a sports media and marketing business headquartered in Argentina. Co-Conspirator #2 was also a controlling principal of a number of subsidiaries and affiliates of TyC, including FPT Sports S.A. (together with its affiliates, "FPT Sports") and Productora de Eventos S.A..  The foregoing companies are referred to collectively below as "Torneos."

11

27.   At various times relevant to the Information, Co-Conspirator #3 and Co-Conspirator #4 were the controlling principals of Full Play Group S.A., a sports media and marketing business with its principal offices in Argentina.   Co-Conspirator #3 and Co-Conspirator #4 also controlled subsidiaries and affiliates of Full Play Group S.A., including, among others, Cross Trading S.A. ("Cross Trading") and Yorkfields S.A.   The foregoing companies are referred to collectively below as "Full Play."

IV.   The Conspirators' Corruption of the Enterprise

28.   Certain individuals and entities employed by and associated with the enterprise, including the defendant SERGIO JADUE, together with others, conspired with one another to use their positions within the enterprise to engage in schemes involving the solicitation, offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks.   Although they also helped pursue the principal purpose of the enterprise, the defendant and his co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery, and money laundering, in pursuit of personal and commercial gain.   The defendant also participated in the corruption of the enterprise by conspiring with and aiding and abetting his co-conspirators in the abuse of

12

their positions of trust and the violation of their fiduciary duties.

29.   To further their corrupt ends, the defendant and his co-conspirators provided one another with mutual aid and protection.  The conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities.  The conduct engaged in by various members of the conspiracy included, among other things: the use of "consulting services" agreements and other similar types of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, financial advisors, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees, and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice.  Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

13

30.   The damage inflicted by the defendant and his co-conspirators was far-reaching.  By conspiring to enrich themselves through bribery and kickback schemes relating to media and marketing rights, among other schemes, the defendant and his co-conspirators deprived FIFA, the confederations, and their constituent organizations - and, therefore, the national member associations, national teams, youth leagues, and development programs that rely on financial support from their parent organizations – of the full value of those rights.  In addition, the schemes had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders.  Finally, the schemes deprived FIFA, the confederations, and their constituent organizations of their right to the honest and loyal services of the soccer officials involved.  Over time, and in the aggregate, such deprivations inflicted significant reputational harm on the victimized institutions, damaging their prospects for attracting conscientious members and leaders and limiting their ability to operate effectively and carry out their core missions.

V.   The Criminal Schemes

31.   Beginning in or about 2012, the defendant SERGIO JADUE, together with others, agreed to engage in multiple

14

schemes, including schemes involving the offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks in connection with the sale of media and marketing rights to soccer tournaments. The defendant and his co-conspirators used the wires of the United States to carry out the schemes, including by accepting bribes paid from and through accounts at financial institutions in the United States. As part of these schemes, the defendant and his co-conspirators over time agreed to receive and did receive millions of dollars in bribes.

32. Set forth below are further details regarding two such criminal schemes in which the defendant and his co-conspirators agreed to engage in connection with their activities with the enterprise.

A.   CONMEBOL Copa Libertadores Scheme

33. In connection with its efforts to promote the sport of soccer in South America, CONMEBOL organized and funded a number of international soccer tournaments to showcase the region's best teams. Among other tournaments, CONMEBOL organized the Copa Libertadores, an annual tournament featuring the top men's club teams. The first edition of the Copa Libertadores was held in 1960 with seven teams. Over the following decades, the tournament evolved into a major competition featuring 38 teams from approximately 10 countries.

15

34.   At various times, CONMEBOL entered into contracts with sports marketing companies to commercialize the marketing rights to the tournament.

35.   In or about and between 2012 and 2015, the defendant SERGIO JADUE, together with other high-ranking officials of CONMEBOL and its member associations, solicited, agreed to receive, and did receive bribes from sports marketing companies, which paid the bribes to obtain, maintain, and renew the marketing rights to the tournament.   JADUE and his co-conspirators used wire facilities and financial institutions located in the United States, among other countries, to make and receive these payments.

B.   <u>CONMEBOL/CONCACAF Copa América Scheme</u>

36.   In 1916, CONMEBOL organized the first edition of the Copa América, a tournament featuring the men's national teams of its members.   According to CONMEBOL, the tournament, which continues to be played today, is the longest continuously running such tournament in the world.

37.   Beginning with the 1987 edition and continuing thereafter through 2011, Traffic held the exclusive worldwide commercial rights for each edition of the Copa América tournament, which rights were secured through a series of contracts between Traffic and CONMEBOL.

16

38. On or about May 25, 2013, CONMEBOL entered into an agreement with Datisa S.A., a partnership among Traffic, Full Play, and Torneos that awarded Datisa the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América as well to the 2016 Copa América Centenario. The contract was for $317.5 million: $75 million for the 2015 edition, $77.5 million for the 2016 edition, $80 million for the 2019 edition, and $85 million for the 2023 edition. In addition, Datisa contracted with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's rights to that tournament as well. By letter agreement dated March 4, 2014, Datisa agreed to pay $35 million to CONCACAF for those rights, which amount was in addition to the $77.5 million Datisa had already agreed to pay to CONMEBOL for CONMEBOL's rights to the same tournament.

39. In or about and between 2012 and 2015, the defendant SERGIO JADUE, together with other high-ranking officials of CONMEBOL and its member federations, solicited, agreed to receive, and did receive bribes provided by sports marketing companies in order to obtain and maintain the marketing rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario. JADUE and his co-conspirators used wire facilities and financial

17

institutions located in the United States, among other
countries, to make and receive these payments.

40.   No disclosure of the foregoing bribery and
kickback schemes was made to FIFA, CONCACAF, or CONMEBOL,
including without limitation to their respective executive
committees, congresses, or constituent organizations.

<u>COUNT ONE</u>
(Racketeering Conspiracy)

41.   The allegations contained in paragraphs 1 through
40 are realleged and incorporated as if fully set forth in this
paragraph.

42.   In or about and between 1991 and the present,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant SERGIO JADUE,
together with others, being persons employed by and associated
with the enterprise, which engaged in, and the activities of
which affected, interstate and foreign commerce, did knowingly
and intentionally conspire to violate Title 18, United States
Code, Section 1962(c), that is, to conduct and participate,
directly and indirectly, in the conduct of the affairs of such
enterprise through a pattern of racketeering activity, as
defined in Title 18, United States Code, Sections 1961(1) and
1961(5).

18

43.   The pattern of racketeering activity through which the defendant, together with others, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise consisted of multiple acts indictable under:

(a)   Title 18, United States Code, Section 1343 (wire fraud, including honest-services wire fraud);

(b)   Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy);

(c)   Title 18, United States Code, Section 1952 (interstate and foreign travel in-aid-of racketeering);

(d)   Title 18, United States Code, Section 1512 (obstruction of justice); and

multiple acts involving bribery, in violation of New York State Penal Law Sections 180.03 and 180.08.   The defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, the last of which would occur within 10 years of a prior act of racketeering activity.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

## COUNT TWO
(Wire Fraud Conspiracy –
CONMEBOL/CONCACAF Copa América Scheme)

44.    The allegations contained in paragraphs 1 through 40 are realleged and incorporated as if fully set forth in this paragraph.

45.    In or about and between 2012 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SERGIO JADUE, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and CONMEBOL and their constituent organizations, including to deprive FIFA, CONCACAF and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

20

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

46.    The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 1963(a), which requires any person or entity convicted of such offense to forfeit: (a) any interest acquired or maintained in violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, and (c) any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

47.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

21

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

48. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offenses.

49. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

22

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

23